IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | §   CRIMINAL ACTION NO. 4:24-CR- |
| v. | §              00003-ALM-AGD-7 |
| | § |
| JO ANN HARRIS | § |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Pending before the court is Defendant Jo Ann Harris's Motion to Suppress (Dkt. #161). After considering the Motion (Dkt. #161), the Government's Response (Dkt. #165), all other relevant filings, and the evidence and oral argument of counsel at the Hearing, the court recommends that Defendant's Motion (Dkt. #161) be denied.

## BACKGROUND

*Factual Background*

At approximately 1:45 a.m. on July 15, 2023, Deputy Kelsin Jay with the Grayson County Sheriff's Office conducted a traffic stop on a blue Ford F-150 on Highway 11 at First Street. Deputy Jay stopped the F-150 because a temporary film was obstructing the view of the license plate. The driver was identified as Defendant Jo Ann Harris. Ashley Navarro, a co-defendant, was identified as the passenger. Deputy Jay testified that Defendant appeared nervous, her hands and voice were shaking, and she avoided eye contact. Deputy Jay informed Defendant that she was not receiving a citation, only a warning. Deputy Jay also asked Defendant to sit in his police cruiser with him. Deputy Jay testified that once in the cruiser, Defendant continued to appear nervous and was talking quickly and touching her face. Defendant stated that she was traveling to her home in Denison from the south side of Fort Worth where she had been shopping at garage sales. Deputy Jay testified that the most direct route from Fort Worth to Denison is Interstate 75. Defendant also

1

noted that she had an interaction with Deputy Jay approximately one month earlier and that she believed that Deputy Jay was "profiling" her. When asked, Defendant stated that she has known Ms. Navarro for approximately three to four years. Deputy Jay posed similar questions to Ms. Navarro, who stated that Defendant picked her up in the Plano area from Ms. Navarro's brother's house. Ms. Navarro also stated that she had known Defendant for approximately eight to nine years.

During this time, Deputy Jay continued to draft a traffic warning for the obstructed license plate. Upon checking Defendant's license, Deputy Jay determined that Defendant had a warrant for drug trafficking out of Bryan County. Deputy Jay then requested a K9 unit. Before the K9 unit arrived, Deputy Jay requested to search the vehicle, to which Defendant declined. While waiting for the K9 unit, Deputy Jay informed Defendant that he had completed most of the warning but that he would not complete it until the K9 unit arrived. The K9 unit arrived approximately 16 minutes later and conducted an open air sniff. The K9 alerted and Defendant was placed in handcuffs. Officers recovered, *inter alia,* approximately 916 grams of methamphetamine from the front passenger floorboard.

Investigator Jordan Clark with the Grayson County Sheriff's Office testified that in May 2023, the Grayson County Sheriff's Office received information regarding the purchase of methamphetamine from Defendant in Sherman, Texas. Investigator Clark also testified that, later in Spring 2023, he and the Durant Police Department conducted a controlled purchase of methamphetamine from Defendant. The Grayson County Sheriff's Office subsequently secured a warrant to track Defendant's location. On the evening of July 15, 2023, Investigator Clark observed Defendant's vehicle travel to the Pleasant Grove and Fairpark areas of Dallas, Texas, but

not to Fort Worth. On July 15, 2023, Investigator Clark contacted Deputy Jay to look for a blue Ford F-150 in connection with the narcotics investigation.

*Procedural Background*

On January 10, 2024, Defendant was charged in a two-count indictment with a violation of 21 U.S.C. § 846, Conspiracy to Distribute or Possess with Intent to Distribute or Dispense Methamphetamine (Dkt. #1). On January 14, 2025, Defendant filed a Motion to Suppress, seeking to suppress all evidence from the traffic stop on July 15, 2023 (Dkt. #161 at 1). On January 30, 2025, the Government filed a Response, arguing that Defendant's Motion should be denied because Deputy Jay had reasonable suspicion that criminal activity was afoot (Dkt. #165 at p. 1). On January 31, 2025, Chief District Judge Amos Mazzant referred Defendant's Motion to the undersigned (Dkt. #166). On March 5, 2025, the court held a hearing on the Motion ("the Hearing") (Dkt. #178). At the Hearing, Deputy Jay and Investigator Clark testified on behalf of the Government. The court admitted the following exhibits:

Government Exhibit 1: Deputy Jay body camera, July 15, 2023

Government Exhibit 2: Photo from Deputy Jay body camera, July 15, 2023

## LEGAL STANDARD

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *U.S. v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. AMEND. IV. The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny. *Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *U.S. v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). To determine whether a seizure is reasonable, the court considers (1) "whether the officer's action was justified at its inception," and (2) "whether the officer's subsequent actions

were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506 (quoting *Terry*, 392 U.S. at 19–20).

When considering whether an officer's actions were justified at their inception, the Supreme Court has stated that the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot." *U.S. v. Arvivu*, 534 U.S. 266, 273 (2002) (quoting *Terry*, 392 U.S. at 30). The Supreme Court has specified that courts must look at the "totality of the circumstances" to see whether the officer has a "particularized and objective basis" for suspecting legal wrongdoing. *Id*. (quoting *U.S. v. Cortez*, 449 U.S. 411, 417–18 (1981)). The totality of the circumstances standard allows officers to draw on their own experience and specialized training to make inferences from cumulative information that might "well elude an untrained person." *Id*. (quoting *Cortez*, 449 U.S. at 418). An officer may not rely on a mere "hunch" to justify a stop. *Terry*, 392 U.S. at 27. The Fifth Circuit has applied *Terry* to traffic stop situations. *U.S. v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010). For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. *Id.* A reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the seizure. *Id*. (citation omitted); *U.S. v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002).

The second prong of *Terry* requires the court to determine "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506 (quoting *Terry*, 392 U.S. at 19–20). As is relevant here, "[a]n officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that

caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *U.S. v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of reh'g,* 622 F.3d 383 (5th Cir. 2010). Thus, "[i]f the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.* (citation omitted).

## ANALYSIS

Here, the court finds that the *Terry* test is satisfied because Deputy Jay had reasonable suspicion to initially stop Defendant and, during that stop, he developed reasonable suspicion of additional criminal activity due, in part, to the collective knowledge doctrine. The court thus recommends that Defendant's Motion to Suppress (Dkt. #161) be denied.

***Prong One***

As to the first *Terry* prong, the court finds that Deputy Jay had reasonable suspicion to initially stop Defendant.[1] "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Banuelos-Romero*, 597 F.3d at 766. At the Hearing, Deputy Jay testified that he pulled Defendant over because "the film that was over the temporary license plate . . . made it unreadable." (TR 10). Pursuant to the Texas Transportation Code,

> (a) A person commits an offense if the person attaches to or displays on a motor vehicle a license plate that:
> . . .
> (7) has a coating, covering, protective substance, or other material that:
> (A) distorts angular visibility or detectability;
> (B) alters or obscures one-half or more of the name of the state in which the vehicle is registered; or

---

[1] Defendant did not dispute the validity of the initial stop at the Hearing (TR 5).

>   (C) alters, covers, or obscures the letters or numbers of the license plate number or the color of the plate.

TEX. TRANSP. CODE ANN. § 504.945(a)(7). Accordingly, Deputy Jay had "objectively reasonable suspicion" of a traffic violation before stopping Defendant's vehicle. The court thus finds that the first *Terry* prong is satisfied.

***Prong Two***

The second *Terry* prong is also satisfied. The court first notes that Deputy Jay detained Defendant "beyond the time needed to investigate the circumstances that caused the stop" because the K9 unit was unrelated to the circumstances that caused the stop *i.e.*, an obstructed license plate. *Pack*, 612 F.3d at 350. However, because Deputy Jay developed "reasonable suspicion of additional criminal activity in the meantime," it was thus permissible to further detain Defendant "for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.*

**Deputy Jay's First-Hand Observations**

At the Hearing, Deputy Jay articulated several facts that gave rise to a reasonable suspicion that additional criminal activity may have been afoot. First, Deputy Jay testified that, throughout the traffic stop, Defendant's hands and voice were shaking and she spoke quickly (TR 10–11). Deputy Jay further testified that while it is normal for people to be nervous upon being pulled over, Defendant displayed an abnormal level of nervousness, and was "repeatedly yawning" and "constantly touching her face." (TR 13). Defendant continued to appear nervous even after Deputy Jay assured her that she would not receive a ticket for the license plate violation (TR 13).[2]

---

[2] At the Hearing, Defendant disputed that Defendant appeared nervous on the body camera footage. Considering the circumstances, the court likewise strains to identify any abnormal nervous mannerisms on the body camera footage. In any event, assuming *arguendo* that Defendant did not appear abnormally nervous, the court still finds that Deputy Jay had a "particularized and objective basis" for suspecting legal wrongdoing. *See Arvivu*, 534 U.S. at 273 ("The totality of the circumstances standard allows officers to draw on their own experience and specialized training to make inferences from cumulative information that might well elude an untrained person.") (cleaned up).

Next, Deputy Jay testified that the occupants' conflicting stories also contributed to his reasonable suspicion. Defendant stated that she was traveling from the south side of Fort Worth and that she has known Ms. Navarro for approximately three to four years (TR 14–15). Conversely, Ms. Navarro stated that Defendant picked her up in the Plano area from Ms. Navarro's brother's house (TR 16). Ms. Navarro also stated that she had known Defendant for approximately eight to nine years (TR 17).

Third, Deputy Jay testified that the most direct route from Fort Worth to Denison is Interstate 75 (TR 9–10). However, Deputy Jay stopped Defendant while traveling on Highway 11 at First Street (TR 9). Deputy Jay testified that this was especially suspicious because Defendant stated that she "was tired during the course of the traffic stop." (TR 14). Deputy Jay thus noted that "it would make more sense for [Defendant] to take a direct route instead of one that would add a substantial amount of time to her trip." (TR 14).

Finally, Deputy Jay had knowledge that Defendant was suspected of illegally dealing narcotics. Upon checking Defendant's license, Deputy Jay determined that Defendant had a warrant for drug trafficking out of Bryan County (TR 17).

**The Collective Knowledge Doctrine**

Deputy Jay's reasonable suspicion was also based on information provided by Investigator Clark. In determining whether there was reasonable suspicion for the investigative stop, courts "must consider the collective knowledge and experience of the officers involved." *U.S. v. Gonzalez-Rodriguez*, 456 F. App'x 494, 498 (5th Cir. 2012) (citation omitted). Thus, "[u]nder the collective knowledge doctrine, detaining officers are not required to have personal knowledge of the evidence that created the reasonable suspicion, if they conduct an investigative stop based on the request of officers who do possess a reasonable suspicion of criminal activity." *Id.* (cleaned

7

up) (citations omitted). The collective knowledge doctrine also applies "where the arresting officer has personal knowledge of facts which, standing alone, do not establish probable cause but, when added to information known by other officers involved in the investigation, tips the balance in favor of the arrest." *U.S. v. Wright*, 74 F.4th 722, 731 (5th Cir. 2023) (cleaned up) (citations omitted); *see id.* ("Under the collective knowledge doctrine, the detaining officers share the investigating officers' reasonable suspicion, and therefore, the collective knowledge doctrine . . . preserves the propriety of the stop.") (cleaned up) (citations omitted).

Here, Deputy Jay had personal knowledge of Defendant's nervous behavior, Defendant and Ms. Navarro's conflicting stories, the abnormal route Defendant was driving between Fort Worth and Denison, and Defendant's warrant for drug trafficking. Additionally, in the spring of 2023, Investigator Clark was involved in a controlled purchase of methamphetamine from Defendant (TR 50). The Sheriff's Office subsequently began tracking Defendant's location (TR 50). Investigator Clark testified that the Sheriff's Office "believed based off of the previous tracker data and the history of what we had seen through that tracker that when [Defendant] went to Dallas we believe that was to purchase quantities of methamphetamine. . . . And so we contacted Deputy Jay to see if he could make traffic stop and possibly interdict some narcotics coming into our area." (TR 53). Thus, prior to the traffic stop, Investigator Clark contacted Deputy Jay to look for a blue Ford in connection with the narcotics investigation (TR 9).[3] Therefore, based on his personal observations and information provided by Investigator Clark, Deputy Jay developed "reasonable suspicion of additional criminal activity," specifically the possession of narcotics,[4] during the

---

[3] The court notes that the police reports were not offered as evidence by either party.

[4] The gravamen of Defendant's closing argument was that, under *United States v. Jenson*, 462 F.3d 399 (5th Cir. 2006), Deputy Jay lacked reasonable suspicion of a specific crime. However, *United States v. Pack*, 612 F.3d 341 356–57 (5th Cir. 2010) cited specifically to *Jenson, inter alia,* and stated that "[w]e do not view that dicta in these opinions as binding precedent to the extent that their language might be read to require that police have 'particularized suspicion' based on essentially direct evidence of a particular specific crime in order to form the 'reasonable suspicion' needed

course of a lawful stop. *Pack*, 612 F.3d at 350. It was thus permissible to further detain Defendant "for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.*

The Fifth Circuit reached a similar conclusion pursuant to the collective action doctrine in *United States v. Wright*, 74 F.4th 722 (5th Cir. 2023). There, the police department received an anonymous tip stating that a "gold Toyota Corolla was parked on Tanglewood Drive near Glen Arbor Park and that the occupants were dealing drugs." *Id.* at 724. A summary of the call was subsequently sent to Officer Jakobsohn, who arrived at the park within minutes. *Id.* at 725. Officer Jakobsohn pulled up behind the vehicle with her lights activated. *Id.* Almost immediately, the defendant opened the driver's door; Officer Jakobsohn ordered the defendant to stay in his car but the defendant continued to exit. *Id.* After a verbal altercation, Officer Jakobsohn arrested the defendant for "resisting detention" and recovered a pistol and synthetic marijuana. *Id.* The Fifth Circuit held that Officer Jakobsohn had reasonable suspicion to stop the defendant because "[t]he contemporaneous tip, the visual details that Jakobsohn confirmed, the high-crime area, and Wright's evasive response to police presence were enough to give an officer articulable suspicion that crime was occurring (or was about to occur)." *Id.* at 733. The Court emphasized that the combination of information gleaned from the tip and Officer Jakobsohn's observations was sufficient because of the collective knowledge doctrine:

> Multiple police officers received information, and neither A's nor B's information was independently sufficient to constitute reasonable suspicion, but A and B are in communication, and the combination of A's + B's information justified a stop.
>
> Here, the dispatcher (A) knew of the reliability-enhancing details of the tip under *Navarette*, including that it was an eyewitness account of ongoing or recently

---

to justify a detention." On denial of rehearing, the Fifth Circuit clarified that "*United States v. Dortch,* 199 F.3d 193 (5th Cir.1999), did not hold that the reasonable suspicion requirement of a *Terry* stop meant that there must be particularized suspicion of a particular, specific crime, as distinguished from a particular and objective basis for suspecting the detained person or persons of some criminal activity." *Pack*, 622 F.3d at 383 (citations omitted). In any event, the court need not reach that issue because the evidence demonstrates that Deputy Jay developed reasonable suspicion that Defendant was in possession of illegal narcotics during the course of a lawful stop.

>completed drug dealing, along with the specific locational details. Jakobsohn (B) knew some of those details along with the aspects of the tip she visually confirmed at the scene. And both the dispatcher and Jakobsohn were in communication. The "laminated total of the information known by officers who are in communication with one another" (A + B) therefore amounted to reasonable suspicion.

*Id.* at 731. Likewise, here, the combination of information communicated by Investigator Clark to Deputy Jay and Deputy Jay's first hand observations were sufficient to establish reasonable suspicion that Defendant was in possession of narcotics. Furthermore, the finding of reasonable suspicion is bolstered here because Deputy Jay relied on information from Investigator Clark, a law enforcement officer with first hand knowledge of Defendant's involvement in the sale of methamphetamine. Accordingly, the *Terry* test is satisfied because during the stop, Deputy Jay developed reasonable suspicion of additional criminal activity due, in part, to the collective knowledge doctrine.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the court recommends that Defendant Jo Ann Harris's Motion to Suppress (Dkt. #161) be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district

court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 3rd day of July, 2025.**

AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE